**WESTERMAN BALL EDERER**
**MILLER ZUCKER & SHARFSTEIN LLP**
1201 RXR Plaza
Uniondale, New York 11556
(516) 622-9200
John E. Westerman
William C. Heuer
Alexandra Troiano
*Special Litigation Counsel to Allan B. Mendelsohn, Esq.,*
*Chapter 7 Trustee of the Estate of Sprout Mortgage LLC*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
In re:

                                Chapter 7

SPROUT MORTGAGE LLC,

                                Case No.: 23-72433 (REG)

                    Debtor.
----------------------------------------------------------------------X

### TRUSTEE'S OPPOSITION TO DEBTOR'S MOTION TO CONVERT THIS INVOLUNTARY CHAPTER 7 CASE TO A VOLUNTARY CASE UNDER CHAPTER 11

Allan B. Mendelsohn, Esq., the interim Chapter 7 Trustee (the "**Trustee**") of the estate of Sprout Mortgage LLC, the above-captioned Chapter 7 debtor (the "**Debtor**"), by his undersigned special litigation counsel, submits this brief in opposition (the "**Opposition**") to the motion of Sprout Mortgage, LLC (the "**Debtor**" and "**Motion**") seeking entry of an order converting this involuntary chapter 7 case to one pursuant to chapter 11 of title 11, United States Code, §§ 101 *et seq*. (the "**Bankruptcy Code**") and Rules 1017(f)(2) and 9013 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"). As and for his Opposition to the Motion, the Trustee respectfully submits as follows:

## PRELIMINARY STATEMENT

1. The Motion brings into sharp focus some compelling and concerning points in these involuntary bankruptcy proceedings.

2. ***$24.4 million dollars*.** Forensic accountants retained by plaintiffs in the pending FLSA Action[1] determined, after analysis of records that Mr. Strauss provided, that Mr. Strauss received net transfers totaling $24.4 million between January 2020 and September 2022. This was from two (2) entities: $20.1 million was transferred by the Debtor to Recovco Mortgage Management LLC ("**Recovco**"), which in turn transferred $24.4 million to Mr. Strauss.[2]

3. *More than a year*. The Motion relies heavily upon the fact that Mr. Strauss now appears ready to onboard a Chief Restructuring Officer ("**CRO**"), but a CRO candidate appears to have been recommended to Mr. Strauss more than a year ago and rather than have a credible, independent third party put in place, Mr. Strauss chose to remain in control.

4. "***Too little, too late***" is a phrase that comes to mind. "Too little" is in some respects hard to square with the $24.4 million that was transferred to Mr. Strauss, but when viewed from the perspective of what was left behind to deal with claims, "too little" is a good fit. This is particularly so in light of the fact that the Debtor concedes in the Motion that the Internal Revenue Services has "a large claim for payroll taxes" that were not paid. $24.4 million to Strauss, but payroll taxes went unpaid. The Schedules show that just $13.49 remains in the Debtor's bank accounts. *"Too little" for everyone else*. "Too late" because the opportunity to put a CRO in place came long ago and Mr. Strauss chose *not* to do so. Now, when a true

---

[1] *See* n.4, *infra*, for a description.

[2] *See* Exhibit A to the *Declaration of Allan B. Mendelsohn, Esq. in Support of Opposition to Debtor's Motion to Convert this Involuntary Chapter 7 Case to a Voluntary Case Under Chapter 11* submitted herewith ("**Trustee Decl.**"), provided in response to a Rule 2004 subpoena. An additional $7.3 million appears to have been transferred from the Debtor to other parent entities. *See id.*

independent fiduciary is in place and has authority over the Debtor, Mr. Strauss is finally ready to take this step. Of course, this would displace the Trustee. *Too late*.

## BACKGROUND

5.      On July 5, 2023 (the "**Petition Date**"), the Debtor's involuntary bankruptcy proceedings were commenced. On July 31, 2023, the Debtor opposed the involuntary petition and sought dismissal as relief. *See* Dkt. No. 8. On August 11, 2023, the Court entered an Order for Relief under chapter 7 of the Bankruptcy Code and the Trustee was appointed on an interim basis to administer the Debtor's bankruptcy estate. *See* Dkt. Nos. 13, 14.

6.      On August 16, 2023, the Trustee, through counsel, made a written demand to Settlement Services, Inc. ("**Settlement Services**"),[3] to immediately turnover to the Trustee $1,950,000.00 (One Million Nine Hundred Fifty Thousand Dollars) (the "**Funds**") in the possession of Settlement Services. The Trustee's demand was made pursuant to, *inter alia*, Sections 542 and 543 of the Bankruptcy Code. Settlement Services did not comply. The Trustee then sought relief from the Court requiring turnover of the Funds and by Order entered on August 24, 2023, the Court required that Settlement Services hold the Funds and directed that the Funds not be disbursed or distributed "absent an Order of the Bankruptcy Court authorizing and directing the distribution of said [Funds.]"

7.      The "turnover" activity in this case relates to prepetition litigation. Prior to the Petition Date there was litigation involving the Debtor, the Debtor's principal, Mr. Strauss, and other related parties, all as defendants, and multiple plaintiffs whose relationship with the litigation defendants is largely if not solely in the nature of employees and whose claims in large

---

[3] By way of background, Settlement Services is a service provider who administers settlements in lawsuits involving multiple parties, often in the nature of class actions.

part if not completely arise out of the Fair Labor Standards Act ("**Prepetition Litigation**" and the "**FLSA**").

8. On or about June 1, 2023 (*i.e.*, one (1) month before the Petition Date), plaintiffs in the Prepetition Litigation entered into a settlement agreement ("**Proposed Settlement**") with the defendants in those actions, namely, the Debtor, Mr. Strauss, Recovco (the Debtor's parent, from which Mr. Strauss received the $24.4 million described above), Mr. Christopher Wright (a prepetition Sprout Executive), and Mr. Elliot Salzman (a prepetition Sprout Executive) (together, the "**Prepetition Litigation Defendants**"). See Trustee Decl. ¶ 3; *see also* Dkt. No. 43.

9. The Proposed Settlement required that the *Debtor* fund $1,950,000.00 (One Million Nine Hundred Fifty Thousand Dollars) (*i.e.*, the Funds) out of the total proposed settlement amount of $3,500,000.00 (Three Million Five Hundred Thousand Dollars) needed for the settlement of all claims against *all* of the Prepetition Litigation Defendants.[4] For his part, Mr. Strauss is obligated to pay the remaining $1.55 million, although in the Motion the description given is less than clear about whether this is a firm obligation to pay cash in the near-term: "Mr. Strauss has *pledged* substantial assets to those settlements . . . ." See Motion at ¶ 27.[5]

10. In sum, having received net transfers totaling $24.4 million in the run-up to this bankruptcy filing, accomplished using Recovco as intermediary, Mr. Strauss tried to use the last $1.95 million[6] that he left with the Debtor to solve a good portion of *his* problems, and the

---

[4] The Proposed Settlement was filed in the United States District Court for the Eastern District of New York (Civil Case No. 22-cv-4004) (the "**District Court**") [Dkt. No. 201-2] and was signed by Michael Strauss on behalf of the Debtor. *See* Trustee Decl. ¶ 3; *see also* Dkt. No. 43. Note that although Mr. Christopher Wright, the Debtor's prior Executive Vice President and Chief Financial Officer, received $357,291.60 in salary in the prepetition period, he is not contributing to the settlement that inures to his benefit. *See* SOFAs at 30.1, Dkt. No. 105.

[5] $1.55 million "pledged" as compared with a net $24.4 million in transfers in the period of time ending just less than a year before these involuntary bankruptcy proceedings were commenced. *See* Trustee Decl., ¶ 3; *see also* Dkt. No. 43. On October 4, 2023, the Trustee commenced an adversary proceeding seeking turnover of the Funds. *See* A.P. Case No. 23-08066-reg.

[6] According to the Debtor's Schedules, an additional $13.49 in cash remains on hand with the Debtor.

problems of other insiders without those other insiders contributing. *But see* SOFAs at 30.1, Dkt No. 105 (noting Mr. Wright's $357,291.60 in salary payments in the year prepetition).

11. While doing so, it appears that no consideration was given to the payment of taxes. Governmental creditors that have *already* filed claims in this bankruptcy case include:

- The Utah State Tax Commission (2 separate claims)
- The Massachusetts Department of Revenue
- The Missouri Department of Revenue (2 separate claims)
- The Texas Workforce Commission
- The Indiana Department of Revenue
- The Utah Department of Workforce Services
- The New York State Department of Taxation and Finance (amended)[7]
- South Carolina Department of Revenue
- Illinois Department of Employment Security
- The State of Alabama, Department of Revenue
- California Employment Development Department[8]

*See* Claims Register, available online at the Court's website at https://ecf.nyeb.uscourts.gov/cgi-bin/SearchClaims.pl?388630815076626-L_1_0-1. Notably, it was only on September 22, 2023 that the Trustee filed a Notice of Discovery of Assets, Dkt. No. 113, and the bar date for filing claims is December 21, 2023 – in other words, there are *ten (10) more weeks to go* before we will have a sense of the full extent of claims.

12. As for his approach to these bankruptcy proceedings, Mr. Strauss has contributed in the following ways:

- As the purported CEO of the Debtor, presumably it was Mr. Strauss who decided to oppose the involuntary petition. *See* Dkt. No. 8.

---

[7] As this Opposition was being prepared, the New York State Department of Taxation and Finance filed its amended proof of claim in the amount of $355,619.52.

[8] As this Opposition was being prepared, the California proof of claim, in the amount of $2,153,472.02, was filed.

- Mr. Strauss opposed the turnover relief sought by the Trustee. *See* Dkt. Nos. 42, 44. He did this in his capacity as "the chief executive of the debtor" but in doing so was represented by the law firm representing him in his individual capacity, not through counsel to the Debtor. *See* Dkt. No. 42, p. 1.

- When an Order for Relief was entered, Mr. Strauss sought reconsideration. *See* Dkt. Nos. 45, 62, 74.

- Presumably, Mr. Strauss either failed to or refused to cooperate in the process of preparing the Debtor's Schedules and other mandatory bankruptcy case filings, despite an Order entered on August 11, 2023 requiring it, *see* Dkt. Nos. 13, 14, and only complied after yet another Order providing additional time for him to do so, *see* Dkt. Nos. 75, 85, and absent compliance, ordering that Mr. Strauss appear before the Court, *see* Dkt. No. 85.

- Separately, Mr. Strauss's wife, Mrs. Elizabeth Strauss, disregarded an Order of this Court requiring the production of documents and testimony, requiring additional case filings and expense. *See* Dkt. Nos. 21, 27, 69.

Yet, Mr. Strauss now seeks to have the Debtor be a chapter 11 debtor, even though there is no ongoing business, and although he has effectively conceded that he is hopelessly conflicted and unable to act as an estate fiduciary, has *not* yet suggested that he will step down as the Debtor's CEO able to control or at least influence the Debtor's decision-making.

13. Considering the totality of the circumstances, and with Mr. Strauss's and the Debtor's pre- and post-petition conduct in view, the relief sought through the Motion should be denied or, alternatively, a chapter 11 trustee should be put in place and any remaining executives and decision-makers at the Debtor should be removed from positions of authority.

## ARGUMENT

### A.   *Marrama* Applies and There Is No "Procedural Disconnect"

14. The Supreme Court's majority opinion in *In re Marrama*, 549 U.S. 365 (2007) ("*Marrama*"), applies here.

15. Based upon what the Debtor perceives as being a procedural disconnect, the Debtor questions whether *Marrama* applies here. *See* Motion at pp. 5-6. But there is no such

procedural quirk, and even if there were, a procedural quirk cannot carry the weight of overriding principles clearly set out by the Supreme Court.

16. Conversion pursuant to Bankruptcy Code § 706(a) is governed by Bankruptcy Rule 1017(f)(2), which in turn provides conversion pursuant to § 706(a) "shall be on motion filed and served as required by Rule 9013." Fed. R. Bankr. P. 1017(f)(2). Bankruptcy Rule 9013 provides that the motions it governs "shall be served by the moving party within the time determined under Rule 9006(d)" other than motions which may be considered on an *ex parte* basis. Fed. R. Bankr. P. 9013.

17. Bankruptcy Rule 9013 refers motions to convert to Bankruptcy Rule 9006(d), which requires at least seven (7) days' notice of a hearing and provides for written responses not less than one (1) day before the hearing. Fed. R. Bankr. P. 9006(d). Bankruptcy Rule 9006(d) also provides that the motions it governs *can* be made on an *ex parte* basis, but *only upon a showing of cause*. *Id*.

18. There is no procedural disconnect. *Ex parte* relief is available, but only upon a showing of cause.

19. The claimed procedural disconnect that was the basis for the Debtor's question of whether *Marrama* applies in the context of this case – conversion from chapter 7 to chapter 11 – does not exist. *Marrama* applies here. *See In re Euro-American Lodging Corp*., 365 B.R. 421, 425 (Bankr. S.D.N.Y. 2007); *see also In re FMO Assocs. II, LLC*, 402 B.R. 546, 550-51 (Bankr. E.D.N.Y. 2009) (Grossman, J.); 6 COLLIER ON BANKRUPTCY ¶ 706.02[1] (16th Ed., Resnick & Sommer)[9] ("The *Marrama* decision has been held equally applicable to voluntary conversions from chapter 7 to chapter 11, which are governed by the same statutory provision.").

---

[9] Hereinafter, references to "COLLIER ON BANKRUPTCY" are the 16th ed. as cited above.

**B.     *Marrama* Demonstrates That Conversion Should Not Be Granted**

   **i.     Scope of the Inquiry**

20.     The Motion starts with the assertion that "here, the inquiry must be *limited* to whether the debtor qualifies to be a debtor under Chapter 11" and then contends that "conversion of this case is warranted as there is *no evidence of bad faith or abuse of the bankruptcy court's jurisdiction* by the Debtor." *See* Motion at pp. 6-7.

21.     The analysis and considerations are not so limited.

22.     A "cause" analysis is required inasmuch as "cause" is included within the text of Section 1112(b)(1). *See* 11 U.S.C. § 1112(b)(1). The Motion discusses Section 1112, but starts its discussion and analysis at (b)(2). The missing part of the statute (subsection (b)(1)) is important, and provides:

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court *shall convert* a case under this chapter *to a case under chapter 7* or dismiss a case under this chapter, whichever is *in the best interests of creditors and the estate*, for *cause* unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1) (emphasis added).

23.     Rather than starting from the premise that "cause" is sufficient to block conversion to chapter 11 (because it is a basis for *re-converting* to chapter 7 pursuant to Section 1112(b)(1)), the Motion *starts* at subsection (b)(2). And even then, the emphasis set out in the Motion misses the point. Subsection (b)(2) discusses the *high bar* that must be met – here, *by the Debtor* in seeking to convert and keep this case in chapter 11. The Motion glides past the burden that must be met. The statute, however, makes the burden clear:

> (b)(2) The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter *if the court finds and specifically identifies <u>unusual circumstances</u> establishing*

>  *that converting or dismissing the case is <u>not</u> in the best interests of creditors* and the estate, *and* the debtor or any other party in interest establishes that –
>
>  (A) there is a reasonable likelihood that a plan will be confirmed [in a reasonable period of time];[10] and
>
>  (B) the grounds for converting or dismissing the case include an act or omission of the debtor *other than under paragraph (4)(A)* [(*i.e.*, other than for continuing diminution of the estate and the absence of a reasonable likelihood of rehabilitation)] –
>
>  > (ii) for which there exists a reasonable justification for the act or omission; and
>  >
>  > (ii) that will be cured within a reasonable period of time fixed by the court.

*See* 11 U.S.C. § 1112(b)(2) (emphasis (both italics and underline) added).

24. The Motion seems to portray the statutory text in terms of "you *have to* convert to chapter 11 because liquidating plans are OK and the Debtor, through a CRO, can propose that kind of plan as readily as anyone can." *See* Motion at p. 7 *et seq.* But this matter-of-fact approach and analysis misses the mark. Colliers makes this abundantly clear.

> Once the movant has established cause, the burden shifts to the respondent to demonstrate by evidence the *unusual circumstances* that establish that dismissal or *conversion* is *not in the best interests of creditors and the estate*. Courts have much *discretion* in making the determination as to *whether there are unusual circumstances that should prevent dismissal or conversion*. Although a finding of unusual circumstances is within the court's discretion, the word *"unusual" contemplates facts that are not common to chapter 11 cases generally*.

7 COLLIER ON BANKRUPTCY ¶ 1112.05[2] (emphasis added).

25. Taking the misses-the-mark analysis a step further, the Motion effectively contends that the Debtor's performance *in chapter 11* leaves no doubt that "cause" cannot be

---

[10] With just $13.49 in the bank, it is entirely unclear how the Debtor would be able to confirm a chapter 11 plan. Note that, although the Trustee sought turnover and a return of the Funds ($1.95 million), the Debtor and Mr. Strauss opposed such relief.

shown, pointing to the items listed in Section 1112(b)(4). *See* Motion at pp. 8-10. But by its very terms the statute makes clear that the list it includes is illustrative not exclusive ("the term 'cause' *includes*"). *See* 11 U.S.C. § 1112(b)(4) (emphasis added). Of course, the list set out in the statute unremarkably identifies a number of things that happen during the course of average, everyday bankruptcy cases that are indicative of problems, and thus demonstrate "cause". Here, however, we have anything but such a case, and very little affirmative bankruptcy activity by the Debtor to consider.[11] The statute provides a list of things that happen in bankruptcy with some frequency, and because of the nature of the involuntary petition in this case and the challenges brought in opposition to it, of course many of the factors on the statutory list can't be shown. But that is OK.

26.  *Prepetition* conduct is at issue, too, just as much as postpetition conduct. *Marrama* itself makes this abundantly clear:

> Bankruptcy Courts [] routinely treat dismissal for *prepetition* bad-faith conduct as implicitly authorized by the words "*for cause*." In practical effect, a ruling that an individual's Chapter 13 case should be dismissed or converted to Chapter 7 because of *prepetition* bad-faith conduct . . . is tantamount to a ruling that the individual does not qualify as a debtor under Chapter 13. That individual, in other words, is not a member of the class of "honest but unfortunate debtor[s]" that the bankruptcy laws were enacted to protect.

*Marrama*, 549 U.S. at 373-4 (emphasis added) (footnote reference and certain internal quotations omitted); *see also id*. at 367 ("An issue that has arisen with disturbing frequency is whether a debtor who acts in bad faith *prior to*, or *in the course of*, filing a Chapter 13 petition by, for example, fraudulently concealing significant assets, thereby forfeits his right to obtain Chapter 13 relief.").

---

[11] We have plenty of activity, but not typical bankruptcy activity. Activity by the Debtor and Mr. Strauss to oppose the bankruptcy filing and oppose discovery and oppose progress, *Yes*, but activity by the Debtor and Mr. Strauss to advance the bankruptcy process, *No*.

27. The breadth of the conduct in focus on a "cause" analysis where conversion is at issue – *i.e.*, with both pre- and postpetition conduct being at issue – is consistent with this Court's determination in *In re FMO Associates II, LLC*, that a "totality of circumstances" approach is appropriate and provides the Court "the flexibility to consider the specific circumstances of each case and to ensure that only the conduct of a debtor which is truly out of the norm constitutes cause to deny conversion to Chapter 11." 402 B.R. 546 at 552 (Bankr. E.D.N.Y. 2009). And it is particularly appropriate in a case such as this in which there was an involuntary filing and what appears to have been an effort to avoid the kind of scrutiny that a bankruptcy filing brings with it.

    **ii.**     **"Cause" Exists to Deny Conversion**

28. The Debtor's attempt to flip the statutory analysis and make it a "*you can't block conversion*" situation rather than a "*you have to demonstrate unusual circumstances to stay out of chapter 7*" situation, fails. Both pre- and post-petition conduct makes clear that "cause" exists on the facts at hand. The Court "has wide discretion to determine if "cause" exists and how to ultimately adjudicate the case." *Lippman v. Big Six Towers, Inc*., Case No. 20-CV-973 (WFK), 2021 WL 1784312, at *3 (E.D.N.Y. May 5, 2021).

29. From information received from third parties via responses to Rule 2004 subpoenas, the Trustee has learned that the Debtor consulted not only with a CRO candidate a full year prior to commencement of these involuntary bankruptcy proceedings, but also with a well-respected firm with bankruptcy capabilities. *See* Trustee Decl. ¶ 5. During this period of time, the Debtor's bankruptcy counsel met with the personal counsel of Mr. Strauss, who were, likewise, well-respected bankruptcy practitioners. *See* Trustee Decl. ¶ 5. Mr. Strauss had engaged bankruptcy counsel to give him advice in connection with a possible bankruptcy filing by the Debtor? A full year before the *involuntary* filing?

30. Looking back, it becomes clear that these bankruptcy cases could have been commenced a full year earlier than they were, had Mr. Strauss chosen to do so. And if he had, the one-year lookback period for preferential transfers to insiders, *see* 11 U.S.C. § 547(b)(4)(B), probably would have included much more of the $20.1 million that was transferred to Recovco, which in turn appears to have made subsequent transferee transfers to Mr. Strauss. *See* 11 U.S.C. § 550; *see also* Trustee Decl. ¶ 4, Ex. A. Those additional transfers would have shown up on the Debtor's Schedules, but now do not. *See* Dkt. No. 105. On the other side of the coin, if bankruptcy proceedings were never commenced, any avoidable transfer liability of Mr. Strauss (or others) might never see the light of day, *see* 11 U.S.C. § 548. The Prepetition Litigation would have been settled with Mr. Strauss "pledging" just $1.55 million out of the $24.4 million he received, and he could use the remaining $22.85 million he had in hand to settle up his personal exposure with the IRS. Admittedly, this is speculation but at the same time it is not far-fetched.[12]

31. The Trustee respectfully submits that prepetition conduct is particularly relevant in light of the fact that, here, the Debtor appears to have gone to great lengths *not* to commence bankruptcy proceedings.

32. While working *not* to commence bankruptcy proceedings even though the Debtor had retained bankruptcy counsel and Mr. Strauss had retained his own, separate bankruptcy counsel, the "wind-down" was implemented and at the end of the day, the wind-down left the Debtor with just enough in the bank to fund settlement of the majority of the FLSA claims, for the benefit of Mr. Strauss and others. After Mr. Strauss used the Debtor's funds as a deposit on the FLSA liability *that he shares with the Debtor*, just $13.49 was left in the Debtor's bank

---

[12] Delays in providing information like Schedules, and the refusal of Mr. Strauss's wife to respond to a Rule 2004 subpoena, certainly do not mitigate any concerns that might exist in this regard.

accounts. *See* Dkt. No. 105, Form 206A/B. And while all of this was happening, tax claims went unpaid in jurisdiction after jurisdiction. *See* ¶ 11, *supra*, and citations therein. The Trustee has been informed that *payroll taxes* went unpaid. *See* Trustee Decl. ¶ 6. Not only is prepetition conduct relevant, it is highly informative.

33. The Debtor fares no better when postpetition conduct is in focus. In fairness, the fact that the Debtor opposed the involuntary petition is not, in and of itself, particularly informative or instructive.[13] But everything else that has happened in this case has been.

34. Of primary importance in any bankruptcy case, let alone an involuntary case, is disclosure. Complete, candid disclosure is a cornerstone of bankruptcy proceedings. Indeed, the need for complete and candid disclosure is reinforced by the Supreme Court's reminder in *Marrama* that our bankruptcy laws were designed to protect "honest but unfortunate debtors". *See Marrama*, 549 U.S. at 374 (citing *Grogan v. Garner*, 498 U.S. 279, 287 (1991)).

35. Week after week went by without compliance by the Debtor with the basic disclosure requirements of the Bankruptcy Code. The Debtor and Mr. Strauss may not have liked the fact that they were here, and were free to fight the involuntary petition, but compliance with the disclosure requirements of the Bankruptcy Code is not a "maybe" or "when I'm ready" obligation. It should not take repeated emphasis from the Court and Trustee to achieve compliance. But that is, in fact, what was required in order to get compliance. And it bears some emphasis here that although the Debtor is represented by counsel, Mr. Strauss is also represented by a separate law firm; yet, despite having a law firm with ten (10) offices nationwide, and scores of attorneys and other legal professionals at his disposal, Mr. Strauss was unable to complete the same Schedules required to be completed by even a *pro se* individual

---

[13] Pursuing reconsideration, however, though permissible under the Bankruptcy Rules, does bring with it, to one degree or another, a theme of "there will be litigation at every turn."

chapter 11 debtor?  The most reasonable inference to be drawn is that this was about an unwillingness to provide disclosure, not an inability to provide it.

36. It was not until September 20, 2023 that the Debtor filed its Schedules.  The first Order setting the deadline for filing Schedules was entered on August 11, 2023, the same day that the Order for Relief was entered.  *See* Dkt. Nos. 13, 14.  The Order required that Schedules be filed a month later on September 11, 2023.  *See* Dkt. No. 14.  On September 11, 2023, the Schedules were not filed.  Instead, a motion was made seeking to further extend the time within which Schedules could be filed.  *See* Dkt. No. 75.  The Court granted relief and set September 20, 2023 as the filing deadline.  *See* Dkt. No. 85.

37. As is noted above, the most reasonable inference to be drawn is that this was not the result of an inability to provide the disclosures.  It was either a *refusal* to prepare the Schedules by Mr. Strauss, or an *inability* of the Debtor to do so separate and apart from Mr. Strauss and the professionals in his corner.  Either situation is reason for concern.  Either is indicative of postpetition problems.

38. Ultimately, the Schedules were filed.  They show that the Debtor has $13.49 in the bank.  *See* Dkt. No. 105 at Schedule A/B.  Schedule H shows that the Prepetition Litigation Defendants are co-liable with the Debtor in the Prepetition Litigation, and Part 2 of the Debtor's Statement of Financial Affairs ("**SOFAs**") shows the transfer of the Debtor's Funds (*i.e.*, the $1.95 million) for the benefit of all of the Prepetition Litigation Defendants.  The SOFAs do not, however, identify the funds that were transferred to Recovco and then transferred on to Mr. Strauss, however, because those transfers were completed more than a year before these bankruptcy proceedings were commenced and because of the use of Recovco as an intermediary.  *See* discussion at ¶¶ 29-36 and citations therein.

39. Add to this the fact that Mrs. Strauss has not complied with an Order of the Court requiring Rule 2004 discovery. *See* Dkt. Nos. 21, 27, 69.

40. And add to this the fact that Mr. Strauss has done everything possible to either terminate these proceedings or take control of them away from the Trustee. *See* Dkt. Nos. 8 (Answer with request to dismiss), 14 and 75 (Order requiring Schedules to be filed by September 11, 2023, but which was not complied with, and motion to further extend time), 42 (objection to turnover), 45 and 74 (filings in connection with motion to reconsider), 134 (motion to convert).

41. The Motion, for its part, focuses on the illustrative (not exclusive) list of what constitutes "cause". *See* Motion at pp. 8-11. To succeed in preventing conversion to chapter 7 once cause has been shown, the Debtor's argument would (i) have to demonstrate that there are unusual circumstances such that (ii) it is in the best interests of creditors and (iii) the estate (iv) not to convert, (v) that there is a reasonable likelihood that a plan can be confirmed within (vi) a reasonable period of time, (vii) that the showing of cause was based on something other than diminution of the estate and the absence of a reasonable likelihood of rehabilitation, (viii) for which there is a reasonable justification, and (ix) that can be cured in a reasonable period of time. *See* 11 U.S.C. § 1112(b)(2).

42. In an effort to convert and keep the case in chapter 11, the Debtor's analysis focuses on the ability to confirm a liquidating plan, and the Debtor's claimed non-gross-mismanagement of the estate. But the Debtor's argument ignores that the Debtor and Mr. Strauss opposed the turnover motion and that without turnover, the Debtor is left with the $13.49 that Mr. Strauss left behind.[14] To call this case administratively insolvent in a chapter 11 setting would be an understatement. There is no likelihood of confirming a chapter 11 plan on the facts

---

[14] In fairness, multi-million dollar litigation claims are identified in the Schedules as estate assets. Whether those claims are viable, and whether they can be prosecuted with the funds the Debtor has on hand, remain open questions.

present, and once 1112(b)(4)(A) is demonstrated, the analysis is done. *See* 11 U.S.C. § 1112(b)(2)(B) ("other than"). In addition, although the Debtor has no choice but to make the argument, the Debtor's contention that there has not been gross mismanagement of the estate by the Debtor rings hollow based on all of the postpetition failures and obstructionist maneuvering as described herein. *See* 11 U.S.C. § 1112(b)(4)(B). And with $13.49 in the bank, how is the Debtor going to maintain insurance? *See* 11 U.S.C. § 1112(b)(4)(C). Or pay taxes? *See* 11 U.S.C. § 1112(b)(4)(I). And being administratively insolvent, with just $13.49, how can a plan be confirmed or substantially consummated, and how can statutory fees be paid? *See* 11 U.S.C. §§ 1112(b)(4)(J), (M), (K). "Cause" is not only present, it is everywhere.

43.  Based upon the foregoing, the Trustee respectfully submits that whether viewed as a matter of prepetition conduct, postpetition conduct, or both, "cause" has been demonstrated within the meaning of Section 1112(b)(a) of the Bankruptcy Code and the best interests of creditors and the estate are to continue in chapter 7.

### iii.    **Bad Faith**

44.  The Motion also brings into question whether grounds exist to support a finding of bad faith consistent with the analysis and factors considered by the United States Court of Appeals for the Second Circuit in *In re C-TC 9th Ave. Partnership*, 113 F.3d 1304, 1309 (2d Cir. 1997).

45.  In attempting to bring the Court's focus to the typical list of postpetition activity by the Debtor that supports a finding of bad faith, the Debtor claims that none of the relevant factors are present or that if they are, they support the Debtor's position.

46.  But then again, the factors set out in *In re C-TC 9th Ave. Partnership* arose out of a case that bears no resemblance to this case, and the factors it describes and discusses, in turn, have little, if any, real-world application here. Indeed, *In re C-TC 9th Ave. Partnership* arose out

of a single asset real estate bankruptcy commenced after foreclosure proceedings had progressed and a receiver was appointed. *In re C-TC 9th Ave. P'Ship*, 113 F.3d at 1307.

47.     In *In re C-TC 9th Ave. Partnership*, the court found that the chapter 11 case was a bad faith filing. In doing so, the court reiterated some foundational principles:

> When it is clear that, from the date of filing, the debtor has no reasonable probability of emerging from the bankruptcy proceedings and no realistic chance of reorganizing, then the Chapter 11 petition by be frivolous.

*In re C-TC 9th Ave. P'Ship*, 113 F.3d at 1310; *see also id*. ("[I]f there is not a potentially viable business in place worthy of protection and rehabilitation, the Chapter 11 effort has lost its *raison d'etre* . . . .") (quoting *In re Winshall Settlor's Trust*, 758 F.2d 1136, 1137 (6th Cir. 1985)).

48.     Here, we do not have a voluntary chapter 11 case commenced by a failed business with no realistic chance of reorganizing; instead, we have an empty shell of a failed business that has already gone through a prepetition wind-down. The Debtor was forced into this involuntary proceeding, but is now trying to squeeze the proverbial square peg in a round hole by trying to convert. There's nothing to reorganize. It is true that liquidating chapter 11 cases are permissible, but generally speaking there are considerations in those liquidating cases that bear on the analysis; most often, leaving management in place to run an efficient wind-down makes sense and in turn justifies a liquidating chapter 11 case. But here, where the wind-down is complete and *conversion to* chapter 11 is at issue, the foundational principles that helped focus the analysis of the Court of Appeals in *In re C-TC 9th Ave. Partnership* certainly play an important role. The Trustee respectfully submits that the only reasonable inference to be drawn on the facts at hand is that conversion to chapter 11 has been sought with the primary purpose being to displace the Trustee, much like the "chapter 7 to chapter 13" attempt at displacement of the trustee that gave rise to *Marrama*. Credible questions are present regarding prepetition

transfers – the Debtor's Funds were transferred in an attempt to cover the prepetition exposures of the Prepetition Litigation Defendants, it took much more effort than it should have to get compliance by the Debtor with its obligation to file its Schedules, and Court-ordered discovery has not been provided by Mrs. Strauss.  Whether viewed as a matter of "cause" or bad faith in seeking conversion, the Trustee respectfully submits that relief sought through the Motion should be denied.

## CONCLUSION

For each of the foregoing reasons, the Trustee respectfully requests that the relief sought through the Motion be denied, and that the Court grant such other relief as is just and proper under the circumstances.

Dated: Uniondale, New York
October 10, 2023

**WESTERMAN BALL EDERER
MILLER ZUCKER & SHARFSTEIN LLP**

By:   */s/ William C. Heuer*
William C. Heuer, Esq.
John E. Westerman, Esq.
1201 RXR Plaza
Uniondale, New York 11556

*Special Litigation Counsel for Plaintiff Allan B. Mendelsohn, Esq., Chapter 7 Trustee*